EVERS, J. T. C.
This matter concerns an assessment made under the Business Personal Property Tax Act of 1966, N.J.S.A. 54:11A-1 et seq. (the act). At issue is the exemption accorded to certain property by virtue of N.J.S.A. 54:llA-2(b)(3):
*18 “Personal property used in business” shall mean tangible goods and chattels used or held for use in any business, transaction, activity or occupation conducted for profit, but shall not include: ... (3) motor vehicles registered in this state pursuant to Title 39 of the Revised Statutes ....
The pertinent facts follow.
Plaintiffs Browning-Ferris Industries of Elizabeth, New Jersey, Inc. and Browning-Ferris Industries of South Jersey, Inc. (taxpayers, sometimes referred to as BFI of Elizabeth and BFI of South Jersey, respectively) are public utilities licensed by the State of New Jersey to collect and dispose of solid waste. BFI of Elizabeth appeals the Director’s final determinations for the years 1972-1975, inclusive, while BFI of South Jersey complaints deal with the years 1973-1977, inclusive.
BFI of Elizabeth utilizes two basic disposal systems in its refuse removal service: the roll-off container system which consists of a large container that slides on and off a truck chassis by means of a hoist, and the Dempster Dumpster system which consists of a small container that is lifted on and off the chassis. BFI of South Jersey utilizes a roll-off system only. Both systems are designed to collect and move large volume waste from industrial and commercial establishments. Basically, the taxpayers’ operation consists of the following. An empty container is delivered to a customer’s premises by one of the taxpayer’s trucks. If a customer has a full container to be removed and emptied, that container is hoisted on to the chassis by means of a hydraulic hoist mechanism and is transported to the disposal site for emptying. Once emptied, that container is then taken to a new customer and the cycle is repeated.
From 1972 to 1975 BFI of Elizabeth had between 10 and 12 Dumpster vehicles for use with the Dumpster containers and between 10 and 21 roll-off or “dinosaur” vehicles for use with roll-off containers. BFI of South Jersey had between two and four roll-off vehicles during the 1973 to 1977 period. These vehicles were manufactured by a number of companies, including Mack, White and Brockway. During the manufacture of the basic chassis, certain modifications are made to adapt the vehicles to heavy-duty usage, including the mounting of a hydraulic *19 hoist mechanism. This mounting was usually done by the supplier of the mechanisms. The two most common suppliers of the containers were Accurate Industries and Dempster Dumpsters, the latter also being the the supplier and installer of the Dempster Dumpster hoist mechanisms for the taxpayers.
Between 1972 and 1975 BFI of Elizabeth had between 212 to 231 Dumpster containers and 157 to 324 roll-off containers. BFI of South Jersey had between 28 to 72 roll-off containers. This equipment was interchangeable within the limitations imposed by the sizes and types of containers. For example, Dumpster containers could only be used on Dumpster vehicles and roll-off containers could only be used on dinosaur vehicles.
The president of BFI of Elizabeth testified to the two types of containers in question — the roll-off and the Dumpster. The roll-off container has a capacity of 15 to 40 cubic yards and is physically removable from the truck. He stated that the tractor and chassis are manufactured by any number of truck manufacturers, but BFI of Elizabeth primarily purchased the vehicles from Mack Truck Corporation. The modifications necessary to accommodate the container equipment were as follows: a double chassis, a second set of frame rails in order to strengthen the chassis, heavy-duty rear and front axles, and heavier suspension. He estimated the cost of modification to be approximately $5,000 to $10,000. He testified that hoist companies actually mount the container on the chassis. He stated that the cost of installing the hoist and other mechanisms during the time period in question was approximately $14,000 to $15,000. The thrust of his testimony was that once these vehicles are modified for container purposes, they cannot be used for any other purpose without extensive modification entailing great expense.
With respect to the Dumpster containers he stated that they were very similar to the larger roll-off type. He described the Dumpster operation as a system wherein the container is lifted almost vertically off the ground instead of rolling off the truck as is the case with the roll-off, and that in all cases they are lifted hydraulically. He testified that the cost of installing the *20 lifting mechanism called for by the Dempster system was approximately, $12,000 to $15,000. He stated that to his knowledge a Dumpster vehicle has never been converted to any other use and knows of no conversion by anyone else in the industry.
The president of BFI of South Jersey essentially corroborated the testimony of the president of BFI of Elizabeth. His testimony was confined to the roll-off containers since BFI of South Jersey only used the larger roll-off system.
The executive vice-president of a truck manufacturer-distributor testified as to the specific modifications needed for the taxpayers’ business needs. He stated that the truck vehicles were basically highly specialized and, as a practical matter, could not be used for any other purpose, i. e., it is overdesigned in that the top speed is only 50 miles an hour, it has a lower gear ratio, a heavy-duty drive shaft, and other miscellaneous features which would preclude its use as a customary over-the-road vehicle. The sum and substance of his testimony was that it would be totally impractical to convert the truck vehicle. The court completely concurs with the testimony of this confident and credible witness.
The testimony of a principal in a distributor-carrier of solid waste equipment clearly set forth the factual picture of substantial modifications required for the operation of a Dempster system in the taxpayers’ business.
The Director’s only witness was an administrative analyst in the Division of Motor Vehicles who was responsible for the supervision and registration of motor vehicles in that he prepared procedures which were followed by the Bureau of Agencies in registering vehicles. His testimony indicated that the vehicles used for hauling the containers were registered under Title 39 of the Revised Statutes and paid fees on the basis of standard commercial vehicle classification, by gross weight for solid waste vehicles. He stated that only the vehicle is registered — not the container. The fee was based on the maximum carrying weight of the vehicle which included the weight of a fully-loaded container. It must be emphasized that the registration fee was *21 based on the weight of the fully-loaded vehicle inclusive of one full container. The Division registers merely the hauling vehicle and whatever maximum load it can bear.
N.J.S.A. 54:11A 3 provides in pertinent part that “all personal property used in business in this state, not expressly exempted from taxation or expressly excluded from the operation of this act, shall be subject to taxation annually under this act.”[1] As previously stated, N.J.S.A. 54:llA-2(b)(3) provides an exemption from the tax if the subject property is a motor vehicle registered pursuant to Title 39. In accordance with this provision the Director has promulgated an administrative regulation, N.J.A.C. 18:9-3.8:
Equipment mounted on a vehicle is eligible for exemption only if it is an integral part of the basic vehicle, and the basic vehicle would lose its identity should the equipment be removed. If the equipment is not an integral part of the vehicle and can be severed from the vehicle, the equipment is not exempt.
Likewise N.J.A.C. 18:9-3.7 provides:
(a) Those vehicles exempt from tax. Motor vehicles which are registered with the New Jersey Department of Motor Vehicles pursuant to Title 39 of the Revised Statutes and which are used primarily to transport persons or property from place to place are exempt from the tax. These include automobiles, trucks, buses, trailers, commercial trailers, semi-trailers and private utility trailers, including trailers used to haul machinery.
It is well settled that exemptions from taxation, including business personal property taxation, are to be construed strictly, and any doubts that may arise are to be resolved against the taxpayer. Allied Textile Printers v. Div. Director, Taxation, 145 N.J.Super. 456, 368 A.2d 375 (App.Div.1976), and Mal-Brothers v. Taxation, Div., 124 N.J.Super. 55, 304 A.2d 750 (App.Div.1973).
Thus, the task of the court is to construe the applicable statutory provision and administrative regulation in light of the inherent purpose of the entire scheme of the act. The provision itself is clear and unambiguous on its face, for it simply war *22 rants an exemption for “Title 39” vehicles. N.J.S.A. 39:3-20 provides for a registration fee for a commercial motor vehicle based upon gross weight and the vehicle load. It was clearly demonstrated at trial that the subject property — the waste containers — are not registered under Title 39 and are merely used for purposes of Title 39 in determining the vehicle load. Thus the taxpayers invoked the administrative regulation, N.J. A.C. 18:9-3.8, as authority for the exemption. This regulation at least appears to broaden the exemption accorded to Title 39 vehicles in the act. I find that this regulation is substantially in keeping with the letter and spirit of the act, and therefore accord significant weight to it. Even so, I find that it does not support taxpayers’ theory in view of this court’s construction of the statute in light of the legislative purpose.
N.J.S.A. 54:llA-2(b)(3) was derived from N.J.S.A. 54:4-3.21, which provided in pertinent part:
All motor vehicles registered by the motor vehicle department of the state of New Jersey and upon which registration fees have been paid, in accordance with the provisions of Title 39, Motor Vehicles and Traffic Regulation, shall be exempt from taxation under this chapter.
In Colfer v. Kennedy, 7 N.J.Misc. 25, 144 A. 7 (Sup.Ct.1928), this statute was attacked as unconstitutional. It was alleged to be in contravention of the uniformity clause of the State Constitution. The court held that the statute had an inherently reasonable classification and found it constitutional. It opined:
There were reasonable grounds in the legislative mind for creating a separate class of motor vehicles, causing them to be registered and pay a license fee, and exempting them from an ad valorem tax. Such automobiles, it is to be observed, were not only subjected to a privilege or exceptional tax peculiar to their status or use, but for their operation required the use of gasoline, upon which the legislature had imposed a sales tax. A case which is of recent origin and very informative upon this phase of taxation is Salem Co. v. State Board, 97 N.J.L. 386, 117 A. 401; affirmed 98 N.J.L. at 570, 119 A. 926, [7 N.J.Misc. at 26-27, 144 A. 7.]
In 1964 Attorney General F. O. No. 7, 27, the legislative history of N.J.S.A. 54:4-3.21 was set forth. The crux of the Attorney General’s opinion is the observation that
It would thus appear that the purpose of the Legislature ... was to reaffirm the principle that the gasoline taxes on motor vehicles and their use were to be *23 special taxes directed to the purposes expressed, and that the revenue obtained should not be expended for the general use of the State. In substituting one form of tax for the other, the Legislature also included within the broad class of motor vehicles those vehicles which were utilized or, by virtue of their being drawn by motor powered vehicles, engendered the use of motor fuel in travelling the highways.... In this way the Legislature again focused its purpose on a single quid pro quo, that of a special tax on gasoline, specifically directed, as replacement for a general tax on motor vehicles as personal property.... So construed it is clear that the Legislature established two criteria to be applied in determining the class into which a particular type of motor vehicle falls, namely: (1) Is the vehicle in question a motor vehicle duly registered in New Jersey and upon which registration fees have been paid? (2) Does the motor vehicle use cause the use of motor fuel in travelling the highways? Both criteria must apply for the exemption to become effective.
For purposes of resolving the instant matter, the final conclusion of the Attorney General is particularly significant:
Equipment mounted on a vehicle may be considered part of the vehicle itself if that equipment is an integral part of the basic vehicle and the basic vehicle will lose its identity should the equipment be removed. Conversely, equipment merely carried on a vehicle affects neither the status of the carrying vehicle nor the independent status of the equipment carried. See State v. Johnson Lumber Company, Inc., 68 N.J.Super. 276, 278 [172 A.2d 201] (App.Div.1961). Consequently, an exemption will be granted or denied based exclusively on a consideration of the status of the vehicle itself without reference to any equipment added thereto. If the vehicle and the equipment are not severable the determination shall be made on the status of the vehicle without regard to the equipment. If the vehicle and the equipment are severable the determination of the status of the vehicle shall not affect the status of the equipment considered independently.
It is rather obvious that in enacting the Business Personal Property Act of 1966 the Legislature used N.J.S.A. 54:4-3.21 as the source law for the motor vehicle exemption therein. It is equally obvious that the Division of Taxation promulgated N.J. A.C. 18:9-3.8 by restating the final conclusion of the Attorney General in F. O. No. 7 (1964).
While the court does not consider the Attorney General’s opinion controlling in any way, it does regard the opinion as a solid exposition of the various influences on the Legislature concerning the ad valorem taxation of motor vehicles.
*24 The property herein is in fact designed to be easily severable and is not registered under Title 39.[2] Taxpayers simply could not avoid the brute fact that the subject property was unequivocally designed to be a completely independent and totally unintégrated piece of equipment. The primary use of the property was as a trash receptacle that spent the majority of its useful life on customers’ property and not attached to a Title 39 vehicle.[3] The evidence did, of course, fully demonstrate that the Title 39 vehicles were overbuilt to handle the increased weight demand, but the fact of the matter is that the equipment constituting the overbuilding, i. e., the hoist mechanisms and the like, are not taxed under this act. In short, it is this type of equipment that is truly “integrated” within the meaning of the act and not the waste containers. The taxpayers unquestionably proved that such equipment should not be taxed but failed to demonstrate by any standard that the containers were integrated equipment pursuant to N.J.S.A. 54:llA-2(b)(3). When property is easily severable a taxpayer has an extremely heavy burden of proving that the property is integrated within the meaning of the applicable law. It seems that when personal property is actually designed to be severable it necessarily follows that it is not integrated to that from which it is severed. Yet, this decision should not be construed to stand for this general proposition. Each ease must be analyzed strictly upon *25 the unique nature of the subject property since the legal issues involved in cases such as the instant one do not lend themselves to a hard and fast rule of law.
The Director’s final determinations for all years in question are affirmed. The Attorney General is directed to submit an order in conformance with this opinion.

 N.J.S.A. 54:11A-3.1 provides that “any machinery or equipment acquired on or after the effective date of this act shall not be subject to assessment and taxation." The effective date of the act was January 1, 1977.

I am not unmindful of the possible argument that the nature of the subject property does actually cause excessive vehicle load weight which would probably cause an increase in fuel consumption so as to warrant an exemption under the act. Nonetheless, I reject this argument for two reasons. First, there was no evidence demonstrating such an increase in fuel consumption, and even if there were, the principle of strict construction of tax exemptions controls since this argument alone cannot succeed on the facts of this case.

It is important to iterate that for the period in question BFI of Elizabeth had no more than 12 Dumpster vehicles and no more than 231 Dumpster containers; likewise, it had no more than 21 roll-off (dinosaur) vehicles and no more than 324 roll-off containers. BFI of South Jersey had no more than four roll-off (dinosaur) vehicles and no more than 72 roll-off containers. It is quite apparent that the containers were more often at rest than in transit.